PRESENT: Hassell, C.J., Lacy, Keenan, Koontz, Kinser, and
Lemons, JJ., and Carrico,[1] S.J.

PGI, INC.

v.  Record No. 021181

RATHE PRODUCTIONS, INC.

OPINION BY
JUSTICE DONALD W. LEMONS
February 28, 2003

FROM THE CIRCUIT COURT OF ARLINGTON COUNTY
William T. Newman, Jr., Judge

In this appeal, we consider whether the trial court erred
by striking plaintiff's claim for punitive damages and refusing
to submit the issue to the jury for determination, and by
setting aside a plaintiff's jury verdict on a claim of tortious
conversion of property.

I.  Facts and Proceedings Below

PGI, Inc. ("PGI") specializes in the marketing and
production of various events including exhibitions, conferences,
and corporate meetings.  Rathe Productions, Inc. ("Rathe") is a
specialty producer of museum displays.  Beginning in 1997, both
PGI and Rathe provided a range of services to the Smithsonian
Institute ("Smithsonian") for the management and production of
"America's Smithsonian Exposition," a traveling museum that
displayed a variety of historical and cultural exhibits (the
"Exposition").  The Exposition was scheduled to tour ten
selected cities in the United States.  However, after touring

_____

[1] Chief Justice Carrico presided and participated in the
hearing and decision of this case prior to the effective date of

just five cities, the Smithsonian's funding was depleted. The Smithsonian solicited bids for private operation, financing, and management of the Exposition.

PGI and Rathe ("PGI/Rathe") submitted a joint proposal to manage and operate the Exposition, which the Smithsonian accepted. To help secure needed corporate sponsorship to finance the completion of the Exposition's 1997 tour, PGI/Rathe subcontracted Odell, Simms & Associates, Inc. ("OSA"). Unfortunately, the tour ended after reaching only eight of the ten scheduled cities.

Although the Exposition did not complete its tour due to lack of resources, the Smithsonian was encouraged by attendance at the exhibits in the cities visited. Accordingly, the Smithsonian hired PGI/Rathe for $250,000 to conduct a market study (the "Market Study") to investigate the feasibility of producing and touring a self-sustaining international Exposition. PGI/Rathe subcontracted with OSA for aid in the completion of the Market Study. A PGI executive presented the findings of the Market Study to the Smithsonian, which concluded that the risks of such a venture outweighed the potential benefits. After the Market Study was completed, PGI, on behalf of PGI/Rathe and OSA, submitted an invoice to the Smithsonian for the previous management of the Exposition and for conducting

his retirement on January 31, 2003.

2

the Market Study. The Smithsonian did not immediately pay the amounts invoiced, and asked for a more detailed accounting and explanation of the charges.

In an effort to collect all monies owed by the Smithsonian, PGI/Rathe officials met and decided that it would be more advantageous for Rathe to actively pursue payment from the Smithsonian because of its ongoing business relationship with the Smithsonian. After submission of additional billing information, the Smithsonian responded with an offer to pay $127,153.06 for the Market Study and $65,588.51 for management of the Exposition. Rathe countered the Smithsonian's offer by asking for $315,588.51, which included $250,000 for the Market Study and $65,588.51 for management of the Exposition. In a letter dated April 14, 2000, Rathe offered to settle the Market Study and management accounts for $258,320. The letter also indicated that distribution of settlement proceeds would include PGI and OSA. On July 20, 2000, Rathe entered into a settlement agreement with the Smithsonian to satisfy the Market Study and management invoices in exchange for $250,000. Rathe failed to notify either PGI or OSA of the settlement or to distribute any of the proceeds to them. After learning of the settlement approximately six months later, representatives from OSA and PGI demanded that Rathe properly distribute the settlement proceeds, but Rathe refused.

3

On February 1, 2001, PGI filed a motion for judgment in the Circuit Court of Arlington County. Subsequent to PGI filing its motion for judgment, OSA filed a separate suit in the Circuit Court of Arlington County on March 1, 2001 against PGI and Rathe seeking to recover $50,000 in compensatory damages from PGI and/or Rathe for breach of contract. By Order dated May 25, 2001, OSA's suit was consolidated with PGI's suit. Count One of PGI's motion for judgment alleged conversion and sought $125,000 in compensatory damages and $125,000 in punitive damages. In the alternative, Count Two of the motion for judgment alleged assumpsit and sought $125,000 in compensatory damages plus interest and costs, including attorney's fees. Prior to jury selection, Rathe submitted a motion in limine requesting the trial court to order PGI to choose between its tort theory of conversion and its contract theory of assumpsit. The trial court granted Rathe's motion. Forced to choose, PGI chose to proceed to trial on its conversion claim.

Upon completion of PGI's presentation of evidence, the trial court sustained Rathe's motion to strike the claim for punitive damages. At the conclusion of PGI's case-in-chief and after Rathe's motion to strike was argued, OSA presented its evidence on its claim of breach of contract for the subcontracting work it performed for PGI/Rathe. Thereafter, Rathe presented its evidence. At the conclusion of Rathe's

4

presentation of evidence, Rathe again moved to strike PGI's evidence. The trial court refused the motion and allowed the case to be presented to the jury. The trial court instructed the jury that it should return a verdict for PGI if it found that PGI proved by clear and convincing evidence[2] that Rathe had converted PGI's property. The jury returned a verdict in favor of PGI against Rathe in the amount of $100,000, and a verdict of $50,000 in favor of OSA against Rathe.

Rathe's post-trial motions included a renewed motion to strike PGI's evidence and a motion to set aside the verdict. The trial court granted Rathe's motion to strike, set aside the verdict, and entered judgment in favor of Rathe. PGI appeals the adverse judgment of the trial court.

## II. Analysis

On appeal, PGI maintains that the trial court erred by ordering it to elect between its cause of action based in contract and its cause of action based in tort. PGI further maintains that the trial court erred in striking PGI's claim for punitive damages, and in setting aside the jury's verdict and entering final judgment for Rathe. Rathe did not file briefs in the case on appeal and did not participate. We agree with PGI that the trial court erred in striking its claim for punitive

---

[2] There is no issue before us concerning the evidentiary standard to be applied.

5

damages before it was submitted to the jury, and in striking its evidence entirely, setting aside the jury's verdict, and entering final judgment for Rathe.

The final judgment order in this matter recites that the jury's verdict is set aside and final judgment is ordered in favor of Rathe "for the reasons stated in the Court's letter opinion." A review of the trial court's letter opinion reveals three reasons for the trial court's action:

> (1) PGI did not present evidence at trial to establish that a partnership existed between the parties or that the parties had common law duties to each other.

> (2) PGI's claims are solely based on a breach of contract theory, therefore, an action in tort is not appropriate.

> (3) PGI did not present credible evidence to support its claim for conversion.

The trial court erred in each of these holdings.

### A. The Joint Venture

We have previously stated that "[a] joint venture exists where two or more parties enter into a special combination for the purpose of a specific business undertaking, jointly seeking a profit, gain, or other benefit, without any actual partnership or corporate designation." Roark v. Hicks, 234 Va. 470, 475, 362 S.E.2d 711, 714 (1987).

> A joint adventure exists when two or more persons combine a joint business enterprise for their mutual benefit, with an express or implied understanding or agreement that they are to share

6

in the profits or losses of the enterprise, and
that each is to have a voice in its control and
management.

Smith v. Grenadier, 203 Va. 740, 744, 127 S.E.2d 107, 110 (1962)

(quoting 10 Michie's Jurisprudence, Joint Adventures § 2,

p. 695).

The trial court properly instructed the jury concerning the

evidence necessary to find a joint venture between PGI and

Rathe.  On the theory of conversion, the jury had to find that a

joint venture existed in order to reach its verdict in favor of

PGI.  As we have recently stated,

the trial court's authority to set aside a jury
verdict "can only be exercised where the verdict
is plainly wrong or without credible evidence to
support it.  If there is a conflict in the
testimony on a material point, or if reasonable
[persons] may differ in their conclusions of fact
to be drawn from the evidence, or if the
conclusion is dependent on the weight to be given
the testimony, the trial judge cannot substitute
his conclusion for that of the jury merely
because he would have voted for a different
verdict if he had been on the jury."

Shalimar Dev., Inc. v. Federal Deposit Ins. Corp., 257 Va. 565,

569-70, 515 S.E.2d 120, 123 (1999) (quoting Lane v. Scott, 220

Va. 578, 581, 260 S.E.2d 238, 240 (1979)).

The record is more than adequate to support the jury's

finding, and the trial court erred by substituting its own view

of the evidence.  In a letter from the Smithsonian dated May 12,

7

1997 to PGI and Rathe, referred to as a "Notice to Proceed," the following "understandings" are evident:

> [T]he Smithsonian is confident that Rathe/PGI, together with its proposed team, will provide the management and production expertise needed to bring new levels of success to [America's Smithsonian Exposition] and to launch a similar and even more successful international exhibition.

> This letter serves to formally notify Rathe/PGI that it has been chosen as the exclusive contractor of the [Smithsonian] for management and production of the remainder of [the America's Smithsonian Exposition] . . . . This letter also authorizes Rathe/PGI . . . as the exclusive producer of a similar international tour . . . .

The "Notice to Proceed" letter is replete with references to PGI and Rathe in a joint capacity, namely "PGI/Rathe," for a limited purpose. The letter is signed "ACCEPTED AND AGREED" by representatives of PGI and Rathe. The exhibits introduced at trial include a "Proposed International Tour Feasibility Study" submitted to the Smithsonian as "A Joint Venture Report by Rathe/PGI." Finally, the testimony overwhelmingly supports the finding of a joint venture and includes the testimony of Cynthia Engel, President and Chief Operating Officer of PGI, that the relationship with Rathe was "a joint venture and that all expenses would be paid and if there was a profit, it would be split." The evidence reveals that Rathe and PGI created a joint venture with shared management responsibilities and the

8

expectation of shared profits.  The trial court erred in holding otherwise.

### B.  Basis for PGI's Cause of Action

The trial court held that "PGI's claims are solely based on a breach of contract theory[;] therefore, an action in tort is not appropriate."  The trial court's ruling misapprehends the nature of the relationship created between PGI and Rathe and the law that applies.  In Legum Furniture Corp. v. Levine, 217 Va. 782, 787, 232 S.E.2d 782, 786 (1977), we cited 46 Am. Jur. 2d Joint Ventures §§ 36, 37 with approval as follows:

> The rights, duties, and obligations of joint venturers and of members of syndicates, as between themselves, depend primarily upon the terms of the contract by which they assumed that relationship.  They are also affected, however, by certain general principles which operate in the absence of specific provisions in the contract, or sometimes in conjunction with such provisions.  These principles . . . are much the same as, or at least are clearly analogous to, those which govern the relations of partners.

In Roark, 234 Va. at 475, 362 S.E.2d at 714, we restated the principle at stake with greater emphasis: "the rules of law governing the rights, duties, and liabilities of joint venturers are substantially the same as those which govern partnerships."

There is no express contract between PGI and Rathe which establishes this joint venture.  As previously stated, the evidence more than amply establishes an implied contract for a joint venture.  To the extent that this implied agreement does

9

not address an issue, the law of partnership is applied.  The

Virginia Uniform Partnership Act (the "Act"), Code §§ 50-73.79

to -73.149, "governs relations among the partners and between

the partners and the partnership" except as provided in a

partnership agreement and to the extent that the agreement does

not violate certain specific statutory requirements.  Code § 50-

73.81.  If the issue in question is not addressed by the

partnership agreement or the Act, "the principles of law and

equity" apply.  Code § 50-73.82.[3]

At common law, ordinarily one partner was not permitted to

sue another partner before settlement of all partnership

business occurred.  See, e.g., Dulles Corner Props. II Ltd.

P'ship v. Smith, 246 Va. 153, 155, 431 S.E.2d 309, 311 (1993).

But even at common law, an exception to the general rule was

made for circumstances such as those presented in this case.  In

Pugh v. Newbern, 136 S.E. 707, 708-09 (N.C. 1927) (citations

omitted), the Supreme Court of North Carolina stated such an

exception:

> The general rule is that one partner cannot
> sue another partner at law until there has been a
> complete settlement of the partnership affairs
> and a balance struck.
>
> . . . .

---

[3] There is no dispute that the law of Virginia applies to
this controversy.  See Code § 50-73.84.

There are, however, well established exceptions to the general rule. A partner may maintain an action at law against his copartner upon claims growing out of the following state of facts:

. . . .

6. Where the partnership is for a single venture or special purpose which has been accomplished, and nothing remains to be done except to pay over the claimant's share.

See also Johnson v. Jackson, 82 F. Supp. 915, 917 (E.D. Pa. 1949); L.H. Heiselt, Inc. v. Brown, 120 P.2d 644, 646 (Colo. 1941); Ruschoff v. Wachsmuth, 242 N.W. 296, 297 (Minn. 1932); Warren v. Warren, 784 S.W.2d 247, 252 (Mo. Ct. App. 1989); Davis v. Johnson, 689 S.W.2d 297, 300 (Tex. Ct. App. 1985); 59A Am. Jur. 2d Partnership § 552 (2002).

Nothing in the Act abridges this common law exception. Rather, the Act expands the exception by providing the following:

§ 50-73.103 **Actions by partnership and partners.**

. . . .

B. A partner may maintain an action against the partnership or another partner for legal or equitable relief, with or without an accounting as to partnership business, to:

1. Enforce that partner's rights under the partnership agreement;

2. Enforce that partner's rights under this chapter, . . . [; or]

3. Enforce the rights and otherwise protect the interests of that partner, . . . .

11

A cause of action for conversion lies independent of an action in contract and may provide a separate basis, distinct from the contract, upon which one partner may sue another. The trial court erred in holding to the contrary.

C. Conversion

In United Leasing Corp. v. Thrift Ins. Corp., 247 Va. 299, 305, 440 S.E.2d 902, 905 (1994) (quoting Universal C.I.T. Credit Corp. v. Kaplan, 198 Va. 67, 75, 92 S.E.2d 359, 365 (1956)), we stated that the tort of conversion "encompasses 'any wrongful exercise or assumption of authority . . . over another's goods, depriving him of their possession; [and any] act of dominion wrongfully exerted over property in denial of the owner's right, or inconsistent with it.' " The trial court erred in holding that PGI did not prove the elements of conversion.

As previously noted, PGI proved the creation of a joint venture with Rathe with the expectation of "split" profits. Upon completion of the objective of the joint venture, all that remained was the collection of accounts receivable from the Smithsonian and payment of OSA. When difficulties arose in the collection of sums due to the joint venture from the Smithsonian, a further agreement was reached between the joint venturers to authorize Rathe to negotiate and settle the claim. Thereafter, Rathe wrote the Smithsonian indicating that a compromised settlement figure "will allow PGI, [Rathe] and [OSA]

12

to receive a reduced final payment."  A settlement was reached with Rathe executing the settlement agreement on behalf of its co-venturer, PGI.  Rathe received $250,000 from the Smithsonian but refused to pay any of the proceeds to PGI or pay the outstanding billing of OSA, contrary to its express agreement to do so.

Upon the evidence presented, the jury was entitled to find that Rathe without justification wrongfully withheld settlement proceeds from PGI.  None of the elements to sustain a cause of action for conversion are missing.

### D.  Punitive Damages

Citing insufficient evidence, the trial court struck PGI's claim for punitive damages without submission of the issue to the jury.  In Baker v. Marcus, 201 Va. 905, 909-10, 114 S.E.2d 617, 620-21 (1960) (internal citations omitted), we summarized our prior cases concerning the award of punitive or "exemplary" damages.

> Compensatory damages are awarded as compensation for the pecuniary loss – as amends or recompense for the injury inflicted.  Exemplary damages are something in addition to full compensation, and something not given as plaintiff's due, but for the protection of the public, as a punishment to defendant, and as a warning and example to deter him and others from committing like offenses.

. . . .

13

The theory upon which exemplary, punitive, or vindictive damages, sometimes called "smart money," are allowed is not so much as compensation for the plaintiff's loss as to warn others, and to punish the wrongdoer if he has acted wantonly, oppressively, recklessly, or with such malice as implies a spirit of mischief, or criminal indifference to civil obligations.

. . . .

Exemplary damages are allowable only where there is misconduct or malice, or such recklessness or negligence as evinces a conscious disregard of the rights of others. But where the act or omission complained of is free from fraud, malice, oppression, or other special motives of aggravation, damages by way of punishment cannot be awarded, and compensatory damages only are permissible . . . .

Wilful or wanton conduct imports knowledge and consciousness that injury will result from the act done. The act done must be intended or it must involve a reckless disregard for the rights of another and will probably result in an injury. Ill will is not a necessary element . . . .

Proof of actual malice is not necessary. Malice may be inferred from circumstances.

No evil intent can be presumed from a mere mistake, or misadventure. "An absence of evil purpose is an absence of malice. No mere inadvertence, mistake, or accidental occurrence can be malicious, although negligent. . . ."

Viewing the evidence in the light most favorable to PGI, as we must, PGI and Rathe were joint venturers for a particular purpose. They agreed to split revenues equally. Upon completion of the venture, billing problems arose. Empowered with the authority to settle, Rathe accepted $250,000 from the

14

Smithsonian in full satisfaction of outstanding claims of the joint venture on July 25, 2000. In breach of its duty of loyalty, duty of care, and obligation of good faith and fair dealing (Code § 50-73.102), Rathe did not inform PGI that it had received the $250,000 in settlement from the Smithsonian. Approximately six months later in late January 2001, PGI discovered through a telephone conversation with an OSA representative that Rathe had received the settlement funds. That same day, PGI telephoned Rathe and made a demand for its and OSA's portion of the proceeds. Rathe refused. Thereafter, PGI filed suit.

If reasonable persons, upon the facts presented, could differ regarding whether the conduct in question was so willful and wanton as to show a conscious disregard for the rights of others, "the trial court may not remove the issue of punitive damages from the jury's consideration." Huffman v. Love, 245 Va. 311, 315, 427 S.E.2d 357, 360 (1993). The trial court erred in doing so in this case.

### E. Election

PGI assigns error to the trial court's order that it elect between theories of tort and contract. Our resolution of other issues in this appeal renders it unnecessary to address this assignment of error.

### F. Conclusion

15

For the reasons stated, the trial court erred in refusing to submit the issue of punitive damages to the jury and in setting aside the verdict of $100,000 in favor of PGI and entering judgment for Rathe.  We will reinstate the jury's verdict and remand to the trial court with directions to enter judgment on the verdict and empanel a jury to hear evidence and decide PGI's claim for punitive damages.

<u>Reversed and remanded.</u>