# CIRCUIT COURT OF FAIRFAX COUNTY

DPR, Inc., of Virginia

 v.

Thomas Dinsmore
and Raymond Clatworthy

    Case No. CL-2009-12552

Magill Enterprises, Ltd.

 v.

DPR, Inc., of Virginia

    Case No. 2009-13137

Michael Magill

 v.

DPR, Inc., of Virginia

    Case No. CL-2009-13138

DPR, Inc., of Virginia

 v.

Michael Magill
and Magill Enterprises, Ltd.

    Case No. CL-2010-988

    April 6, 2011

BY JUDGE JANE MARUM ROUSH

These four cases were consolidated for trial. A three-day bench trial was held from January 31 to February 2, 2011. At the conclusion of the trial, the court took the cases under advisement. I have now thoroughly reviewed the pleadings and the exhibits in the case. In addition, I have fully considered the testimony adduced at trial as well as the arguments of counsel. For the following reasons, the court will enter an order finding in favor of the plaintiff in DPR, Inc., of Virginia v. Thomas Dinsmore et al., Case No. CL-2009-12552, Magill Enterprises, Ltd. v. DPR, Inc., of Virginia, Case No. 2009-13137, and Michael Magill v. DPR, Inc., of Virginia, Case No. CL-2009-13138. The court will enter an order finding in favor of the defendant in the case of DPR, Inc., of Virginia v. Michael Magill et al., Case No. CL-2010-988.

*Background*

These cases each arose from the business relationship between Michael Magill, Thomas Dinsmore, and Raymond Clatworthy. In 1983, Dinsmore and Clatworthy were the principals of DPR, Inc., a Virginia corporation that owned a restaurant in Annandale, Virginia. At the time, the restaurant was operating as a Shakey's Pizza franchise. Dinsmore and Clatworthy met Magill in Magill's capacity as a field manager for Shakey's. Magill, Dinsmore, and Clatworthy went into business together in two pizza delivery businesses. These ventures were apparently mutually satisfactory to the businessmen, because, in 1986, Magill paid $40,000 to $50,000 to acquire 25% of the outstanding shares of DPR, Inc. Magill became the day-to-day manager of the restaurant for Dinsmore and Clatworthy, who did not live in the area. Magill was not at that time an officer or a director of DPR, Inc.

From the beginning, the restaurant's primary business was providing buffet meals to school groups traveling to the area by tour bus to visit the sites in Washington, D.C. According to Clatworthy, "student travel was the heart and soul of our business."

In 1988, Magill wanted to start a management company that would do more than operate the restaurant for DPR, Inc. He wanted the ability to be involved in other enterprises. Dinsmore and Clatworthy agreed with Magill's plan. Magill started Magill Enterprises, Ltd. ("Magill Enterprises"). Magill ceased being an employee of DPR, Inc. Magill Enterprises became an independent contractor of DPR, Inc. Magill Enterprises operated the restaurant for DPR, Inc., and charged it a management fee. Magill continued being a shareholder of DPR, Inc.

Also in 1988, Magill Enterprises started a box lunch business. The clientele of the box lunch business was the same as that of the restaurant,

student tour groups. Originally, Magill Enterprises prepared the box lunches at a facility in Alexandria, Virginia, unrelated to the restaurant. In 1992 or 1993, however, Magill Enterprises began to use the facilities at the restaurant to prepare the box lunches.

The parties disagree about whether Dinsmore and Clatworthy knew and approved of Magill Enterprises's box lunch business. Magill claims Dinsmore and Clatworthy knew that he was conducting a box lunch business "on the side" from the beginning. Dinsmore and Clatworthy testified that they knew nothing of the business until May 2007, some nineteen years after it began and 14 years after it began to be operated out of the restaurant's premises.

Magill testified that Magill Enterprises's box lunch business had no adverse effect on the restaurant's business. Magill Enterprises generally did not use the restaurant's food to make the lunches. The sandwiches for the box lunches were assembled at the restaurant in the afternoon, using meat, cheese, and bread purchased separately by Magill Enterprises. The box lunches were then "assembled" using the restaurant's pizza preparation tables. The boxes were packed with sandwiches, potato chips, fruit, and cookies. The lunches were stored in the restaurant's walk-in refrigerator until they were delivered by Magill the next day. Magill Enterprises used the restaurant's food only when the box lunches included fried chicken. In that event, according to Magill, he took care to reimburse the restaurant for his use of its chicken and cooking oil. The lunches were assembled by Magill, and restaurant employees worked "off the clock" and were paid in cash by Magill Enterprises. Magill testified that he treated the employees as "casual labor."

In 1993, Magill became unhappy with the level of compensation that Magill Enterprises received from DPR, Inc. As a result, Magill Enterprises's management fee for operating the restaurant was increased. Magill became a director of DPR, Inc., and began receiving director's fees. In addition, Magill was granted more stock in DPR, Inc. He eventually owned 33% of the outstanding shares. (Dinsmore and Clatworthy each owned 33% of DPR, Inc.)

Also in 1993, Magill learned that the corporate existence of DPR, Inc., had lapsed in 1987 due to its failure to file annual reports with the State Corporation Commission. The business was renamed "DPR, Inc., of Virginia" and was reincorporated in Virginia. DPR, Inc., and DPR, Inc., of Virginia will be hereafter referred to collectively as "DPR."

In 1998, the restaurant ceased being a franchisee of Shakey's Pizza. At some point, the restaurant was renamed "Magill's." The business was cyclical. Business was best in the spring, when students visited Washington, D.C., during their spring breaks. Business was slowest in the fall months. During the slow periods, the restaurant would have cash flow problems. By agreement among Magill, Dinsmore, and Clatworthy, Magill Enterprises

would advance funds to DPR to pay for rent, salaries, and supplies. DPR agreed to repay Magill Enterprises for any such advances, together with interest at the rate of 8% per year. Clatworthy testified that, from 1999 to 2007, DPR's principal source of credit was Magill and Magill Enterprises.

In addition, when cash flow was a problem, Magill would defer receiving shareholder dividends from the corporation, and Magill Enterprises would defer receipt of management fees owed. DPR agreed to pay interest at the rate of 8% *per annum* to Magill and Magill Enterprises on any unpaid or deferred amounts. (The parties have referred to "dividends" throughout their pleadings and at trial. The court will adopt that nomenclature, although "distributions" of earnings is a more accurate description given that DPR is an S corporation.)

In 2006, Dinsmore and Clatworthy (but not Magill) had taken $17,000 in dividends in excess of what DPR had available to distribute. That was treated as a $17,000 loan to each of Dinsmore and Clatworthy on DPR's books. Dinsmore and Clatworthy told Magill that he should take $17,000 out of the company when the cash flow improved. Magill never received $17,000 related to the 2006 dividends.

In 2007, the restaurant's lease was due to expire after twenty-five years. Negotiations with the landlord to renew the lease were unsuccessful. In the spring of 2007, Magill, Dinsmore, and Clatworthy realized that the restaurant might have to close. Magill advised Dinsmore and Clatworthy that Magill and Magill Enterprises were owed "a lot of money" in deferred dividends, unpaid management fees, and loans to the company. Dinsmore and Clatworthy assured Magill that they would "true up" what was owed.

In early May 2007, Dinsmore and Clatworthy directed Magill to issue dividend checks to each of the shareholders for $37,000. DPR did not have enough money to pay dividends at that level. Instead, Magill wrote a check to each shareholder (including himself) for $20,000. Later, Dinsmore and Clatworthy directed DPR to forgive their loans from DPR in the amount of $17,000 each.

Dinsmore and Clatworthy paid a surprise visit to the restaurant on May 22, 2007. According to Magill, they appeared to be shocked to see the extent of the box lunch business being conducted on the restaurant's premises. Dinsmore and Clatworthy testified that they knew nothing of the box lunch business until earlier in May 2007 when a restaurant employee told them that a substantial box lunch business had been conducted "off the books" from the premises for years.

On June 7, 2007, Magill was voted out as a director of DPR. Magill Enterprises was terminated as the manager of the restaurant. Dinsmore and Clatworthy continued to run the restaurant for a brief period of time before it was closed on July 15, 2007. Magill Enterprises entered into a lease for the restaurant premises on October 1, 2007, and is presently operating a restaurant on the site. For the next two months, Dinsmore and Clatworthy

wound down the affairs of DPR. Dinsmore and Clatworthy paid themselves management fees and other distributions during that time.

This state of facts led to the four lawsuits presently under consideration. Those suits will be considered in the order in which they were filed.

*DPR, Inc., of Virginia v. Thomas Dinsmore et al.*
Case No. CL-2009-12552

This case is a derivative suit, brought by Magill in his capacity as a shareholder of DPR on behalf of DPR against Dinsmore and Clatworthy. DPR alleges a claim for breach of fiduciary duty against Dinsmore and Clatworthy.

DPR alleges that Dinsmore and Clatworthy breached their fiduciary duties to DPR by paying themselves exorbitant management fees, by making loans and distributions to themselves, by reclassifying entries in DPR's books, by failing to account for the 2007 net profit of $275,583, and by not properly accounting for the source of negative retained earnings of $137,952.

The court concludes that DPR has proven, by a preponderance of the evidence, that Dinsmore and Clatworthy breached their fiduciary duties to the company by improperly forgiving their loans to the corporation and paying themselves management fees far in excess of the reasonable value of any services rendered to DPR. The court concludes that DPR's claims of other instances of breach of fiduciary duties have not been proven by a preponderance of the evidence.

The court will enter judgment in favor of DPR against Dinsmore and Clatworthy in the amount of $26,949 each. That amount consists of $17,137.00 in loans from DPR forgiven in May 2007 and $9,812 in excessive management fees.

In this case, DPR also asked for an accounting of any improper distributions taken by Dinsmore and Clatworthy from DPR from 2002 to 2007. The court concludes that the three-day trial in this case was the functional equivalent of an accounting. The corporate books and transactions were analyzed by experts, who testified about such transactions to the extent that they could be discerned and reconstructed from the corporation's books and records. The court sees no benefit to prolonging this case by referring it to a commissioner for further proceedings, which are likely to prove fruitless. Therefore, the requested for an accounting will be denied.

## *Magill Enterprises, Ltd. v. DPR, Inc., of Virginia*
### Case No. CL-2009-13137

Magill Enterprises alleges one count of breach of contract and one count of unjust enrichment against DPR. Magill Enterprises alleges that DPR never repaid it for the amount it infused into DPR when DPR's cash flow suffered due to the cyclical nature of the school tourism business.

The court concludes that Magill Enterprises has shown by a preponderance of the evidence that it is owed $131,818.60, plus interest of $64,275.85 as of August 27, 2009. Magill Enterprises is owed interest on the unpaid principal sum at the rate of 8% per year from August 27, 2009, until paid. Therefore, judgment will be entered in favor of Magill Enterprises against DPR in those amounts.

## *Michael Magill v. DPR, Inc., of Virginia*
### Case No. 2009-13138

Magill, in his individual capacity, brings suit against DPR for unpaid dividends.

DPR is an S corporation for federal taxation purposes. As such, the parties agree, distributions of earnings to shareholders must occur at the same time and be proportionate to the shareholders' ownership interests in the business. This is because an S corporation may have only one class of stock.

The evidence at trial showed that Dinsmore and Clatworthy regularly declared dividends that the company did not have sufficient funds to pay. In that event, they took the dividends for themselves and Magill's dividends were deferred, with a promise that they would be paid when the cash flow improved. (Dinsmore and Clatworthy do not dispute that Magill is owed something for unpaid dividends; they simply dispute the amount owed.)

The court concludes that Magill has proven by a preponderance of the evidence that he is owed dividends from DPR in the amount of $39,532.34 as of August 27, 2009. In addition, he is owed interest of $5,331.53 as of that date. Interest will continue to accrue on the unpaid principal in the amount of 8% *per annum* until paid. Accordingly, judgment will be entered in favor of Magill in those amounts.

## *DPR, Inc., of Virginia v. Michael Magill et al.*
### Case No. CL-2010-988

In this case, DPR brings suit against Magill and Magill Enterprises alleging causes of action for wrongful conversion of the box lunch business from DPR, wrongful conversion of DPR's assets in conducting the box lunch business, and breach of fiduciary duty.

Most of the evidence at trial was devoted to the issue of the box lunches. Much evidence was heard on the issue of whether Dinsmore and Clatworthy knew about the existence of the box lunch business at all and, if they did, whether they knew of the extent of the use of the restaurant's equipment, facilities, and employees to conduct the business.

Resolution of these issues is primarily one of the credibility of the witnesses. The court resolves those issues of credibility against Magill. The court concludes that Dinsmore and Clatworthy, who lived out-of-state and made only scheduled visits to the restaurant, knew little or nothing about the existence or the extent of Magill's side business. Dinsmore and Clatworthy probably had general knowledge in 1988 that Magill started a box lunch business based in Alexandria. They most likely did not know, however, that the business gradually shifted its operations to the restaurant's premises in Annandale. They almost certainly did not know that, over the years, the box lunch business developed into a regular user of the restaurant's facilities, equipment, and employees.

By prior order of this court, DPR's claims that Magill and Magill Enterprises converted "intangible property" of DPR were stricken from the case. See Order of Judge White dated September 17, 2010. DPR's claims that Magill somehow usurped a corporate opportunity belonging to DPR is such an "intangible property" interest within the meaning of that order.

What remains in this case is the issue of whether Magill and Magill Enterprises converted tangible assets belonging to DPR in operating the box lunch business. The tort of conversion encompasses any wrongful exercise or assumption of authority over another's goods, depriving him or her of their possession, and any act of dominion wrongfully exerted over property in denial of the owner's right or inconsistent with it. *PGI, Inc. v. Rathe Productions, Inc.*, 265 Va. 334, 344, 576 S.E.2d 438 (2003).

The court concludes that DPR has proven by a preponderance of the evidence that Magill and Magill Enterprises converted the tangible assets of DPR in conducting the box lunch business. The defendants did not deprive the plaintiff of the use of the property, but they "wrongfully exerted [dominion] over [the] property" to an extent "inconsistent" with the plaintiff's rights in the property.

The issue, then, becomes what damages has DPR proved resulted from Magill and Magill Enterprises's conversion of DPR's assets? The measure of damages for conversion, when the conversion is complete, is the fair market value of the goods converted at the time and place of the conversion. *Straley v. Fisher*, 176 Va. 163, 10 S.E.2d 551 (1940).

In this case, however, the conversion was not "complete." Magill and Magill Enterprises did not permanently deprive DPR of all use of the restaurant's tables, fryers, refrigerators, or storage space. (In fact, at the end of the lease term, DPR sold the restaurant equipment for $30,000.) Rather,

Magill and Magill Enterprises used the property at the same time it was being used by DPR.

Cases in which the personal property of another is used without authorization, but the conversion is not complete, tend to involve the common law cause of action known as "trespass to chattels." "Trespass to chattels" is defined as "[a]n unlawful and serious interference with the possessory rights of another to personal property." *Black's Law Dictionary*, 1503 (6th ed. 1990). "Trespass to chattels survives today . . . largely as a little brother of conversion." *Prosser and Keeton on The Law of Torts* § 14 (5th ed. 1984). In *Vines v. Branch*, 244 Va. 185, 418 S.E.2d 890 (1992), the Supreme Court of Virginia opined:

> Where a person has illegally seized the personal property of another and converted it to his own use, the owner may bring an action in trespass. . . .

*Vines v. Branch*, 244 Va. 185, 190, 418 S.E.2d 890 (1992). The measure of damages for trespass to chattels is the "actual damages suffered by reason of loss of [the chattels'] use." *Id.*

At trial, DPR presented no evidence of either the fair market value of the goods at the time and place of the conversion nor the actual damages suffered by DPR by reason of the loss of the use of the personal property. DPR presented evidence that the value to Magill and Magill Enterprises of their use of DPR's property was $1,147,620.

DPR cites no authority for its position that the proper measure of damages for the defendants' conversion of DPR's property is the value derived by the defendants from that conversion.

Because DPR has failed to produce any evidence of damages DPR suffered as a result of the defendants' use of its equipment, the court will find for the defendants on the claim of conversion.

DPR's breach of fiduciary duty claim is similarly infirm. DPR originally argued that Magill usurped a corporate opportunity when he started the box lunch business in 1988. At trial, however, DPR stipulated that Magill owed no fiduciary duties to DPR before 1993, when Magill became a director. By that time, the box lunch business had been ongoing for five years. It was about 1992 to 1993 when the box lunches began to be assembled on the restaurant's premises. Assuming it was a breach of fiduciary duty for Magill to use DPR's premises to assemble and store the box lunches, DPR has not shown any damages. DPR's evidence at trial of damages was confined to an estimation of the value to Magill Enterprises of its use of DPR's facilities, not the damage caused to DPR resulting from that use. For example, DPR introduced no evidence of any depreciation of or damage to its equipment as a result of Magill's use. There was no evidence of the fair rental value of the equipment. There was no evidence of

any damages to DPR as a result of Magill's divided loyalties. Because of a lack of credible evidence of damages to DPR, the court will find for Magill on the breach of fiduciary duty claim in this case.

## Conclusion

For the foregoing reasons, the court will enter an order finding in favor of the plaintiff in DPR, Inc., of Virginia v. Thomas Dinsmore et al., Case No. CL-2009-12552, Magill Enterprises, Ltd. v. DPR, Inc., of Virginia, Case No. 2009-13137, and Michael Magill v. DPR, Inc., of Virginia, Case No. CL-2009-13138. The court will enter an order finding in favor of the defendant in the case of DPR, Inc., of Virginia v. Michael Magill et al., Case No. CL-2010-988.